**02D09-2006-PL-000252**
Allen Superior Court 9

Filed: 6/30/2020 4:32 PM
Clerk
Allen County, Indiana
BB

| STATE OF INDIANA | ) | IN THE ALLEN SUPERIOR COURT |
|---|---|---|
| | ) SS: | |
| COUNTY OF ALLEN | ) | CAUSE NO: |

JOHNATHAN DECKER,                )
                                   )
          Plaintiff,                )
                                   )
v.                )
                                   )
FLAGSTAR BANK, INC.,                )
                                   )
          Defendant.                )

## COMPLAINT FOR DAMAGES

Plaintiff, Johnathan Decker ("Decker"), by counsel, for his causes of action against the Defendant, Flagstar Bank., Inc. ("Flagstar"), states and alleges as follows:

### I.    INTRODUCTION

1.    This is an action brought by Decker for race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). On May 31, 2019, Decker filed a Charge of Discrimination against Flagstar asserting that Flagstar discriminated and retaliated against him in employment on the basis of race in violation of Title VII. Decker claims he is a qualified black individual who has worked for Flagstar at its place of business located at 6302 E. State Blvd., Fort Wayne, Indiana 46805 since on or about January of 2017 as a float teller. In July 2018, Decker approached the District Manager, Brian Souers ("Souers") about comments made about his race from customers and the issues were never addressed. There have been many comments made by customers, such as, "Go Back to Where You Came From", "Can't Believe a Black Guy is Working". In addition to those comments, as early as September 2018, a customer berated Decker with insults because he followed company policy and would not provide

information on an account that did not have her name on it. The customer proceeded to call Decker a "bitch" and inferred that Decker "was not a man anyway." In February 2019, a customer made a comment about Decker's tie and said it should have been a noose and "remember when black people would get hung by a noose?" After reporting the issue to Branch Manager, Jenny Cenko ("Cenko") and District Manager Brian Souers ("Souers"), Decker was instructed to take two days off with pay. When Decker returned to work on March 4, 2019, he was terminated.

Decker seeks all damages available to him including back pay, front pay, compensatory damages, punitive damages, and legal fees and costs.

## II.     PARTIES

2.      Decker is an individual citizen and resident of Fort Wayne, Allen County, Indiana.

3.      Flagstar is a corporation organized and existing under the laws of the State of Indiana with its principle place of business in Troy, Michigan which operates a store located at 6302 East State Blvd., Fort Wayne, Indiana 46815.

## III.    JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction by virtue of 28 U.S.C. § 1331 with respect to the Title VII claim, in addition to the federal court jurisdiction conferred by Title VII, 42 U.S.C. § 2000e-5(f)(3). This Court is the proper venue pursuant to 28 U.S.C. § 1391 as Flagstar operates a facility in Fort Wayne, Allen County, Indiana, and Decker worked at that location and resides in Fort Wayne, Indiana.

## IV.    FACTS

5.      Decker incorporates by reference paragraphs 1-4 of his Complaint as if same were fully set forth herein.

6.      At all times relevant hereto, and for approximately two years, Decker was employed by Flagstar at its store located at 6302 E. State Blvd., Fort Wayne Indiana as a float teller.

7.      Decker was initially employed with Wells Fargo as a float teller beginning in January 2017 and continued with Flagstar after the merger with Wells Fargo. On December 1, 2018, Flagstar eliminated the float teller position and Decker was permanently assigned to the Georgetown location as a teller.

8.      Decker was considered to be a good teller with satisfactory work performance.

9.      In July of 2018, Decker reported several issues to the District Manager, Brian Souers ("Souers") about comments made about his race from customers.

10.     In August of 2018, Decker was given a Final Warning due to a verbal altercation with a customer due to a situation where the customer was berating Decker. Decker not wanting to take the insults from the customer any longer, responded to the customer.

11.     In January 2019, Decker was shown a video by the Service Manager, Nancy Spencer ("Spencer"), that showed Spencer's son repeatedly saying "nigga", on her cell phone.

12.     On February 27, 2019, a customer referred to a tie that Decker was wearing as looking like a noose and that "do remember when black people would get hung by a noose?" After reporting the issue to Branch Manager, Jenny Cenko, and Brian Souers, Decker was told to take two days off with pay. When Decker returned to work on March 4, 2019, he was told that his employment had been terminated.

13.     Despite reporting the incidents of racial discrimination from customer and following Flag Star's Non-Harassment, Anti- Harassment and Non-Retaliation Policy, the Defendant did not act to protect the Plaintiff from continued harassment and verbal assault.

14. As a direct result of the discrimination and retaliation against him, Decker has suffered damages including lost pay, lost benefits, and emotional distress.

15. On March 31, 2019, Decker filed a Charge of Discrimination against Defendant. See Exhibit 1.

16. On May 1, 2020, a Notice of Rights was issued to Decker. See Exhibit 2.

## V. STATEMENT OF CLAIMS

### COUNT I – RACE DISCRIMINATION

17. Decker incorporates by reference paragraphs 1-16 of his Complaint as if same were fully set forth herein.

18. Flagstar, through its employees and management, have discriminated against Decker on account of his race in violation of Title VII.

19. As a result of the unlawful discrimination, Decker has been damaged.

### COUNT II – UNLAWFUL RETALIATION UNDER TITLE VII

20. Decker incorporates by reference paragraphs 1-19 of his Complaint as if same were fully set forth herein.

21. Decker has been unlawfully retaliated against on account of his filing a Charge of Discrimination and making complaints to Flagstar about race discrimination.

22. Decker has suffered damages on account of the unlawful retaliation against him.

## VI. PRAYER FOR RELIEF

WHEREFORE, Decker prays for judgment in his favor and for the following relief:

a) back pay and benefits;

b) front pay and benefits;

c) compensatory damages;

d)  punitive damages;

e)  legal fees;

f)  costs of this action; and

g)  all other relief appropriate under the circumstances.

Respectfully Submitted,

***THEISEN & ASSOCIATES, LLC***

John C. Theisen (#549-02)
Nathaniel O. Hubley (#28609-64)
810 South Calhoun Street, Suite 200
Fort Wayne, IN 46802
Telephone: (260) 422-4255
Fax: (260) 422-4245
jtheisen@theisen-associates.com
nhubley@theisen-associates.com
*Attorneys for Plaintiff*

**02D09-2006-PL-000252**

Allen Superior Court 9

Filed: 6/30/2020 4:32 PM
Clerk
Allen County, Indiana
BB

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| X | FEPA | EO-0174-A19 |
| X | EEOC | 24D-2019-00268 |

**City of Fort Wayne Metro Human Relations Commission** and EEOC

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Johnathan P. Decker, II | | 1995 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1016 Ridgewood Dr., Apt. 2, Fort Wayne, IN 46805 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| FLAGSTAR BANK | Unknown | (260) 461-6046 |

| Street Address | City, State and ZIP Code |
|---|---|
| 6302 E. State Blvd., Fort Wayne, IN 46815 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest: 01-01-2018  Latest: 03-04-2019 |

DISCRIMINATION BASED ON:
[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
[X] OTHER (Specify) Harassment

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a qualified black individual who was employed by Flagstar Bank ("Flagstar") from January 2017 until March 4, 2019. Around the summer of 2018, I reported several issues to District Manager, Brian Sours ("Sours") about comments made about my race from customers and the issues were never addressed. Around January 2019, Service Manager, Nancy Spencer ("Spencer"), showed me a video of her son repeatedly saying "nigga" on her cell phone. In February 2019, a customer proceeded to tell me that I was wearing the tie and I should have a noose around my neck, and that I should be hanging from a tree. After reporting the issue to Branch Manager, Jenni Cenko ("Cenko") and Sours, I was told to take two (2) days off with pay. Upon returning to work on March 4, 2019, I was informed by Sours and Cenko that my employment had been terminated.

For these reasons, I believe I was harassed based on my race, black, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended and Fort Wayne Ordinance G-21-78, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

May 31, 2019
Date | Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)   5-31-20

AMBER MARIE MANCARROW, Notary Public
Allen County, State of Indiana
Commission Number 650639
My Commission Expires January 29, 2022

**EXHIBIT 1**



# AGREEMENT TO MEDIATE

CHARGE NUMBER: 24D-2019-00268
FEPA NUMBER: EO-0174-A19

Charging Party: Johnathan P. Decker, II
Respondent: FLAGSTAR BANK

This is an agreement by the above parties to participate in mediation in the above referenced charge. The parties understand that mediation is a voluntary process, which may be terminated at any time. The parties and, if they desire, their representatives and/or attorneys, are invited to attend a mediation session. No one else may attend without the permission of the parties and the consent of the mediator(s).

The mediator(s) will not function as the representative of either party. However, the mediator(s) may assist the parties in crafting a settlement agreement. Each party acknowledges being advised to seek independent legal review prior to signing any settlement agreement. The parties acknowledge that they have received a copy of the Mediation Fact Sheet. The parties acknowledge that the mediator(s) possesses the discretion to terminate the mediation at any time if an impasse occurs, or either party or the mediator deems the case inappropriate for mediation.

The parties acknowledge that participation in the scheduled mediation does not constitute an admission by either party of any wrongdoing or of a violation of the laws enforced by EEOC. Furthermore, the Charging Party acknowledges that participation in the scheduled mediation by the Respondent does not commit the Respondent to providing a monetary resolution of the matter.

The parties recognize that mediation is a confidential process and agree to abide by the terms of the attached Confidentiality Agreement. The parties acknowledge that if a settlement is reached as a result of the mediation, the assigned mediator(s) is required to report to EEOC any benefits received. This information is reported only for purposes of providing aggregate data to the EEOC for mediation program evaluation purposes, and the individual terms of the agreement will not be disclosed to the public.

| | | | | |
|---|---|---|---|---|
| _Charging Party_ | 5-31-2019 Date | | Respondent | Date |
| **Johnathan P. Decker, II** | | | **FLAGSTAR BANK** | |
| Charging Party Printed Name | | | Respondent Printed Name | |
| / (765) 251-3178 | | | (260) 461-6046 / | |
| Charging Party Phone & Cell Phone | | | Respondent Phone & Cell Phone | |
| | | | | |
| Charging Party's Representative | Date | | Respondent's Representative | Date |
| | | | | |
| CP Representative Printed Name | | | R Representative Printed Name | |
| / | | | / | |
| CP Representative Phone & Cell Phone | | | R Representative Phone & Cell Phone | |



**U.S. Equal Employment Opportunity Commission**
**City of Fort Wayne Metro Human Relations Commission**

2310 Parnell Avenue
Fort Wayne, IN 46805
Fax: (260) 427-1126
(260) 427-1145

May 31, 2019

## CONFIDENTIALITY AGREEMENT

EEOC NUMBER 24D-2019-00266

1. The parties agree to participate voluntarily in mediation in an effort to resolve the charge(s) filed with the EEOC

2. The parties agree that all matters discussed during the mediation are confidential, unless otherwise discoverable, and cannot be used as evidence in any subsequent administrative or judicial proceeding Confidentiality, however, will not extend to threats of imminent physical harm or incidents of actual violence that occur during the mediation

3. Any communications between the ADR Coordinator and the mediator(s) and/or the parties are considered dispute resolution communications with a neutral and will be kept confidential.

4. The parties agree not to subpoena the mediator(s) or compel the mediator(s) to produce any documents provided by a party in any pending or future administrative or judicial proceeding. The mediator(s) will not voluntarily testify on behalf of a party in any pending or future administrative or judicial proceeding. The parties further agree that the mediator(s) will be held harmless for any claim arising from the mediation process

5. Mediation sessions will not be tape-recorded or transcribed by the EEOC the mediator or any of the participants. All information including all notes, records or documents generated during the course of the mediation shall be destroyed at the conclusion of the session. Parties or their representatives are not prohibited from retaining their own notes. However, EEOC will not maintain any such notes or records as part of its record keeping procedures

6. If a settlement is reached by all the parties, the agreement shall be reduced to writing and when signed shall be binding upon all parties to the agreement. If the charge(s) is not resolved through mediation, it is understood by the parties that the charge(s) will be transferred to the investigative unit for further processing

| | | | |
|---|---|---|---|
| _signature_   5-31-20 | | | |
| CHARGING PARTY          DATE | | RESPONDENT          DATE | |

| | | | |
|---|---|---|---|
| CHARGING PARTY          DATE
REPRESENTATIVE | | RESPONDENT          DATE
REPRESENTATIVE | |

# **Metropolitan Human Relations Commission**



## <u>Acknowledgment of Role of Commission and</u>
## <u>Lack of Attorney-Client Relationship</u>

1) I understand that I have been advised of my right to consult with a private attorney at any time throughout the processing of my charge at the Metropolitan Human Relations Commission.

2) I understand that the Metropolitan Human Relations Commission staff, including but not limited to the Executive Secretary, Administrative Assistant, Investigators, Staff Attorney, or Executive Director do not represent me in any capacity as a private attorney and owe no duty of confidentiality or loyalty as contemplated in an attorney-client relationship.

3) I understand that the Metropolitan Human Relations Commission staff cannot give me legal advice or legal opinions regarding my charge filed with the Commission, or any other matter.

4) I understand that I do not have an attorney-client relationship with the Metropolitan Human Relations Commission or its staff.

5) I understand that the role of the Metropolitan Human Relations Commission is that of a neutral fact-finder and not as an advocate.

By signing below, I am acknowledging that I have read and understand the above paragraphs.

_____         5-31-2019
Signature                                   Date

Johnathan P. Decker III
Print Name

## METROPOLITAN HUMAN RELATIONS COMMISSION

### AUTHORIZATION TO RELEASE INFORMATION

I, Johnathan P. Decker II, hereby expressly authorize and request any doctor, hospital, school, or other educational facility, employer, governmental agency (including but not limited to Police, Prosecutor, or County Sheriff), credit agency, or lending institution, landlord, or any other person, or any agency possessing information, documents, papers, tapes, or records to release same or copies of same into the possession of: *(1) The Metropolitan Human Relations Commission, or (2) any Investigator or (3)-authorized agent of the Commission, or upon request said Commission, Investigator, or Agent.* I hereby release all such persons from any liability, and hereby expressly waive any claims, which might otherwise arise from the release and use of such information, documents, papers, tapes or records. I have read the foregoing and do understand the meaning thereof.

*The Commission will only request information that is relevant to your claim of discrimination.

5/31/2019
Date

Date of Birth: 10 / 17 / 2019

1015 Ridgewood Dr. Apt. 2
Street Address

Signature

Johathan P. Decker II
Print Name

Fort Wayne
City

IN
State

## BEFORE THE CITY OF FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

IN THE MATTER OF:        )
                              )

Johnathan P. Decker II
   Complainant          )     Metro No.  EO-0174-A19
                            )     EEOC No. 24D-2019-00268

v                               )

Flagstar Bank,
   Respondent          )

### NOTICE OF RIGHT TO APPEAL

The findings of the Metropolitan Human Relations Commission's Determination Panel will become a *FINAL ORDER* of the Commission unless you, within **ten (10) days** of the date of determination, **file written objections and an intention to appeal**. Your written objections should fully state the reason(s) for your disagreement with the Panel's findings. The written objections should:

> **Be filed in duplicate and addressed to the Chair of the Commission stating the reason(s) why you disagree with the Commission's Determination. This should be brought or mailed to Metropolitan Human Relations Commission, 2310 Parnell Avenue, Fort Wayne, Indiana 46805.**

If you choose to file objections requesting an appeal, we will set an **appeal hearing before the full Commission Board**. You or your private attorney will be given the opportunity to explain why the Commission should overturn the findings of the Determination Panel. The procedures regarding the appeal hearing will be provided to you after an appeal has been filed.

_Signature_     5-31-2019     Johnathan P. Decker II
(Signature)        (Date)            (Print Name)

### NOTICE OF RIGHT TO APPEAL TO FULL COMMISSION AND RIGHT TO REVIEW BY THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

I, Johnathan P. Decker II, have been duly advised by Amber Nuncamon, a staff member of the Metropolitan Human Relations Commission ("Metro"), on 5-31-2019, of my right to appeal a decision by Metro's Determination Hearing panel to the full Metro Commission.  After receiving the final determination action from Metro, delivered to me by United States Postal Certified Mail, I have been advised of my right to a substantial weight review by the United States Equal Employment Opportunity Commission ("EEOC").  I must make such a request for review in writing within **fifteen (15) days** of Metro's final determination action.  I have further been informed the EEOC, on receipt of the written request, shall conduct a substantial weight review and notify me as to the outcome of the review.

_Signature_     5-31-2019     Johnathan P. Decker II
(Signature)        (Date)            (Print Name)

**02D09-2006-PL-000252**

Allen Superior Court 9



Filed: 6/30/2020 4:32 PM
Clerk
Allen County, Indiana
BB

## METROPOLITAN HUMAN RELATIONS COMMISSION
## DISMISSAL OF COMPLAINT AND NOTICE OF RIGHTS

**To:**   John C. Theisen

**Re:**   **COMPLAINT DISMISSAL**
**Johnathan P. Decker II vs. Flagstar Bank**
**MHRC No: EO-0174-A19**
**EEOC No:  24D-2019-00268**

**Date:** May 1, 2020

---

The Metropolitan Human Relations Commission has completed its initial investigation and a Determination Hearing Panel has concluded that there is insufficient evidence to warrant your case to proceed further and therefore renders a **NO PROBABLE CAUSE** finding. **ACCORDINGLY, YOUR COMPLAINT IS DISMISSED.** Please pay attention to the following information stated below:

1.   **Right to Appeal Dismissal of Complaint and Time limit for Filing an Appeal**

Please note that pursuant to Commission Rule 1-4.5, you have a right to appeal the dismissal of your complaint to the full Commission. You have **ten (10) days** to file a written motion for appeal. Your deadline for the motion for appeal is **by 12:00 p.m., close of business day, May 15, 2020.** If you do not meet this deadline, the Determination Panel's decision will become this agency's final action on your complaint. The final action of administrative agencies is subject to judicial review.

2.   **Form, manner, number of copies, and contents of an Appeal**

If you decide to request an appeal to the full Commission, you <u>MUST</u> put that request in the form of a written motion. You have the right to submit additional documentary evidence with your motion. You must state the <u>GROUNDS</u> for your appeal in the written motion. Your grounds may include new information that could not have reasonably been known or available, and hence not submitted by you to the Commission during the investigation, or the reason(s) why you did not submit a rebuttal to the Respondent's answer. We require two (2) copies of the written motion for appeal, addressed to the Commission, to be brought in person, mailed, or sent by electronic means (provided that the original and one copy is delivered to the Commission's office within five business days of the electronic receipt) to the offices of the Metropolitan Human Relations Commission, 2310 Parnell Ave, Fort Wayne, Indiana 46805.

3.   **Processing of an Appeal**

A copy of your motion for appeal will be sent to the Respondent. The Respondent has the right to submit written objections to the appeal to the Commission. The Commission will review your motion and the Respondent's written objections and respond in writing to all parties. The Commission will grant the request for an appeal hearing, deny the request, or refer the complaint for further investigation.

1.

*Metropolitan Human Relations Commission*
*2310 Parnell Avenue*
*Fort Wayne, Indiana 46805*



EXHIBIT
2



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

| | | |
|---|---|---|
| STATE OF INDIANA | ) | MHRC NO.   EO-0174-A19 |
| | ) | |
| COUNTY OF ALLEN | ) | EEOC NO.   24D-2019-00268 |

**Johnathan P. Decker II**
1015 Ridgewood Dr.
Apt. 2
Fort Wayne, Indiana  46805
*Complainant,*

v.

**Flagstar Bank**
6302 E. State Blvd.
Fort Wayne, Indiana 46815
*Respondent.*

**John C. Theisen**
**Nathaniel O. Hubley**
810 South Calhoun Street
Suite 200
Fort Wayne, Indiana 46802

**Patrice Baker**
Associate General Counsel
5151 Corporate Drive
Troy, Michigan 48098

## THE DETERMINATION HEARING

**COMES NOW,** the undersigned members of the **Determination Panel** and pursuant to Commission Rule 1-4.4 do make the following determination:

### I.   JURISDICTION

On May 31, 2019, Johnathan P. Decker II, ("Complainant"), filed a complaint against Flagstar Bank, ("Respondent"), alleging that Respondent harassed him based on his race and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, and in violation of Fort Wayne General Ordinance G-21-78 ("Ordinance"), as amended.

### A.   Timeliness

For a complaint to be "timely," Complainant must file with the Commission within 180 days of the last date of harm.  The alleged incident(s) giving rise to these allegations occurred between January 1, 2018 and March 4, 2019 and the complaint was filed on May 31, 2019, well within 180 days of the last date of harm, the timeliness jurisdictional requirement is therefore met.

### B.   Personal Jurisdiction

Respondent's place of business is located at 6302 E. State Blvd., within the territorial boundaries of the City of Fort Wayne, State of Indiana.  The Ordinance requires that the Commission exercise jurisdiction against

1



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

employers with at least six (6) employees.  To be under the jurisdiction of Title VII, an employer must have fifteen (15) or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.  In other words, an employer must have fifteen (15) or more employees each day for a twenty week period during the year the discrimination occurred or the year prior to the discrimination.  Because the Respondent had fifteen (15) or more employees for twenty weeks in the two-year period between March 4, 2017 and March 4, 2019, personal jurisdiction has been met.

### C.    Subject Matter Jurisdiction

As indicated above, Complainant is alleging that the Respondent harassed him on the basis of his race and retaliated against him in violation of Title VII and the Ordinance.  The Commission has authority to enforce both laws.  Subject matter jurisdiction is therefore met.

## II.  THE CHARGE, SUMMARY OF RESPONSE AND REBUTTAL

The Commission's complaint process commences with the filing and acceptance of a charge.  The charge is forwarded to the Respondent for an answer or response to the charge, including an invitation for both parties to enter into voluntary mediation.  Following receipt of the response, the Commission, if it deems necessary, makes pertinent provisions available to the Complainant for a rebuttal.  If a Complainant fails to rebut, the Commission will make a determination on the record available to it, including any independent evidence acquired.  Following a rebuttal, or lack of, the Commission utilizes any series of investigative tools to bring the investigation to as prompt a completion as resources dictate.

### A.    Complainant's Complaint

On May 31, 2019, Complainant alleged and signed the following statement:

> I am a qualified black individual who was employed by Flagstar Bank ("Flagstar") from January 2017 until March 4, 2019.  Around the summer of 2018, I reported several issues to District Manager, Brian Sours ("Sours") about comments made about my race from customers and the issues were never addressed.  Around January 2019, Service Manager, Nancy Spencer ("Spencer"), showed me a video of her son repeatedly saying "nigga" on her cell phone.  In February 2019, a customer proceeded to tell me that I was wearing the tie and I should have a noose around my neck and that I should be hanging from a tree.  After reporting the issue to Branch Manager, Jenni Cenko ("Cenko") and Sours, I was told to take two (2) days off with pay.  Upon returning to work on March 4, 2019, I was informed by Sours and Cenko that my employment had been terminated.
>
> For these reasons, I believe I was harassed based on my race, black, and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended and Fort Wayne Ordinance G-21-78, as amended.

2



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

**B.    Respondent's Response to Complainant's Charge**

Respondent denied the allegations and in summary stated the following:   During Complainant's employment with Wells Fargo he was a float teller.   Complainant reported to Nancy Spencer ("Spencer"), Service Manager, who reported to Bryan Souers ("Souers"), Regional Manager for Wells Fargo.   Spencer recalled Complainant being a good teller with satisfactory work performance.   Spencer also recalled an incident from August 2018 when Complainant called a customer a "fucking clown" and that she was lucky that she was a woman, otherwise he would "beat her ass."   The incident was witnessed by two (2) of Complainant's co-workers.   Complainant admitted to what happened.   Spencer informed Souers of the incident and Souers placed Complainant on a final written warning and told Complainant that any further incident of this nature would result in immediate termination.

Complainant became an employee of Respondent on December 1, 2018.   Respondent eliminated the float teller position and Complainant was permanently assigned to the Georgetown Branch as a teller.   Jenny Cenko ("Cenko"), the Branch Manager, at the Georgetown location was familiar with Complainant when he was a float teller.   Cenko recalled other tellers complaining to her about how Complainant would not service certain customers.

On Friday February 22, 2019, Complainant got into an altercation with a bank customer he was servicing at the drive-up window.   The customer reported to Spencer that she asked Complainant what the withdraw limit was at the drive-up window.   Complainant stated that he could not tell her the limit but that she could request an amount and he would tell her if she could withdraw that amount.   The customer was frustrated that Complainant could not just answer the question and requested to withdraw $2000.00.   Complainant told her that he could not process that amount at the drive-up window and she would need to go inside.   The customer became even more frustrated and began arguing with Complainant.   The customer told Complainant to "shut the fuck up" and Complainant replied, "No, you shut up."

When questioned about the incident the only difference Complainant indicated was that he said "no you" to the customer and denied saying the words "shut up."   Spencer counseled Complainant on the importance of professionalism, reviewed how Respondent expects employees to handle upset customers, and informed him to get a manager if a situation is going to escalate.   Complainant stated that he disagreed with Spencer's advice and that he would not allow anyone to disrespect him.   Respondent took Complainant's response as him indicating that he would not adhere to Respondent's expectations when dealing with irate customers.

The situation and Complainant's response to Spencer's counseling was reported to Souers.   At this time, Souers decided to terminate Complainant since Souers had given Complainant a last chance warning for the August 2018 incident.   Before the termination could be finalized with Human Resources, the February 27, 2019 situation that Complainant mentioned in the complaint took place.

On February 27, 2019, Complainant was handling a transaction for "Mr. G." a regular bank customer.   A teller working two (2) windows down reported that she heard Complainant raise his voice and say, "oh no you just didn't say something about a noose to me!"   Mr. G. appeared to be baffled and at a loss for words.

3



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

Complainant stated that he couldn't believe that Mr. G. said that to him and that he needed to walk away before he said something he shouldn't. Complainant made a few more comments before he left his window and stormed into the breakroom. Complainant continued to vent in the breakroom and could be heard in the lobby.

Another employee reported that she walked into the breakroom to find Complainant upset. The employee asked Complainant what was wrong. Complainant explained the situation as him being a victim to a hate speech done by Mr. G. Complainant described the conversation to be normal at first then Mr. G. went on to talk about how Complainant had the "wrong kind" of tie on then said, "You know, the ones that hand from trees."

Cenko was not in the bank when the incident occurred but received a text message from another employee that Complainant got into an argument with a customer so Cenko returned. Upon entering the bank, Cenko could hear Complainant in the breakroom from the teller area. Cenko went into the breakroom and Complainant told her that the customer made a joke about a noose. Cenko asked why the customer would do that and Complainant got in Cenko's face and stated that he was the victim, that Cenko had no right to ask why, and that he did nothing wrong. Complainant then requested to balance his drawer and go home. Cenko said he could.

Cenko was in no way trying to defend the customer; she was surprised to hear what transpired and was merely reacting in the moment to what she had heard. Another employee witnessed the interaction with Complainant and Cenko. The employee stated she witnessed Complainant give Cenko a brief description of what happened then Cenko stated something along the lines of, "Why would he say that?" Complainant then felt Cenko was trying to justify what the customer said. Complainant then asked to balance his drawer and go home. Cenko allowed it.

The February 27, 2019 incident was reported to Souers who worked with Cenko to investigate what happened and determine the course of action with the customer. Complainant was not terminated for the incident that involved Mr. G. The decision to terminate was made prior to the incident with Mr. G.

**C.    Complainant's Rebuttal**

Complainant submitted a rebuttal on August 27, 2019 and stated in summary the following: Respondent is missing information and has altered other information. In August 2018, Complainant was approached by a customer who berated him with insults because he wouldn't give the customer information on an account that did not have their name on it. When Complainant called manager, Beth Cenceleski, to assist she tried to force Complainant to complete the transaction. The customer called Complainant a "bitch" and said, "You aren't a man anyway." Complainant told the customer that they were "acting like a clown and if I wasn't a man I would have reacted when you said that." Nancy Spencer ("Spencer") was not around for the interaction. Complainant was the first person to inform Souers of the incident as well as staff members at the Clinton and Rudisill branch. Complainant told Souers that he did not cuss or call the customer out of their name.

4



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

Any customer that Complainant refused to assist was for a good reason. Complainant encountered several racists and rude people. When he reported the issues to management they didn't do anything about it and sometimes the abuse came from the management, which was reported to the district manager.

During the incident on February 22, 2019, Spencer told Complainant that if anything similar happens again to tell her and she would inform the customer that they were being inappropriate. Complainant told Spencer that there should be a consequence if someone behaves that way and that if it happened again they should have their account closed out. Complainant told Spencer that the last word he said to the customer was "no" then he signed and turned the microphone off. Souers told Complainant that the situation was not reported to him until the next incident occurred so Respondent couldn't have had plans to terminate Complainant prior.

Complainant did not storm into the breakroom to vent. Complainant did not speak until he was spoken to. Complainant denies getting in Cenko's face.

## III.    SUMMARY OF INVESTIGATIVE PROCESS AND EVIDENCE

The Commission, in all, interviewed relevant witnesses and reviewed documents. Below is a summary of the evidence obtained during the investigation:

### A.    Respondent's Harassment Policy/Handbook

1.    **Non-Harassment, Anti-Harassment and Non-Retaliation Policy (May 2017)**
The policy was provided by the Respondent and states in summary the following: Respondent does not condone or tolerate any form of harassment. Prohibited harassment includes any verbal, written or physical conduct that denigrates or shows hostility or aversion toward an individual. Respondent expects and encourages employees to report all incidents of harassment to a manager or Human Resources Business Partner. Employees or applicants will not be subject to retaliation for reporting harassment or for participating in an investigation of alleged harassment. Any reported allegations of harassment, discrimination or retaliation are investigated promptly.

2.    **Standards of Conduct Policy (May 2017)**
The policy was provided by the Respondent and states in summary the following: Respondent expects employees to behave in a manner to provide a proper, safe and healthy atmosphere. Some examples of prohibited behavior would be refusal to accept or follow directions or being insubordinate to a manager, dishonesty, theft, causing a disturbance by yelling or using obscene or indecent language, threatening, intimidating or assaulting another employee, client or customer and violating any other policy, practice or workplace procedure.

5



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

3.   **Corrective Action Policy (May 2017)**
The policy was provided by the Respondent and states in summary the following: A violation of Respondent's policies, practices or procedures may be so serious that a single incident could result in termination. Other violations may result in increasingly serious warnings and a chance to improve performance prior to termination. Respondent maintains the right to start the disciplinary process at any logical step from counseling to immediate termination.

B.   **Telephone Interviews**

1.   **Nancy Spencer ("Spencer") – Branch Manager**
This phone interview was conducted on March 17, 2020 and the witness stated in summary the following: Respondent has a harassment and retaliation policy. If an employee feels they have been harassed, they can report the harassment to any member of management. Once reported, the manager gets in contact with their Human Resources Business Partner and they work together to investigate the issue and find a resolution. Respondent's discipline policy varies on the severity of a violation. The policy is progressive but if a violation is more severe then steps can be skipped. The steps are in order of a verbal warning, informal written warning, a written warning then a termination. If there is an issue between an employee and a customer the employee and customer would be separated. The manager would then talk to the employee involved, other employees present and possibly the customer. The manager would then get the Human Resources Business Partner involved to further investigate, if needed.

Spencer was not aware of Complainant being told to "go back where he came from" or "I can't believe there is a black guy working" from a customer. Spencer also denied showing Complainant a video of her son saying the word "nigga" on her phone.

Spencer was not involved in the incident that involved a customer calling Complainant a "bitch" or saying that he was "not a man" but did hear about it. Spencer was told by Brian Souers ("Souers") that a customer wanted to do a transaction and Complainant told the customer he could not do it because it was against policy. Complainant was removed from the situation and an investigation was conducted. Complainant was disciplined for his conduct.

Spencer was also aware of the situation that took place between Complainant and a customer after the customer referenced a noose. Spencer did not know details and was unsure if any discipline was given. Spencer was also aware of a situation that took place prior to the incident involving the noose. This incident took place between Complainant and a customer in the drive thru. The customer wanted to withdraw money and wanted to know the withdraw limit. Complainant informed the customer that he could not disclose what the limit was and to request an amount and then he could tell her if he could do it. The customer got upset and requested $2,000.00. Complainant told the customer that he

6



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

could not do that amount through the drive thru. The customer told Complainant to "shut-up." Complainant then told the customer, "No, you shut up." Complainant explained the situation the same way except he only admitted to saying, "No, you." After this incident, Souers and the Human Resources Business Partner decided to terminate Complainant. Spencer was unaware of why it took so long to deliver the termination to Complainant.

2.   **Jenny Cenko ("Cenko") – Branch Manager**
This phone interview was conducted on March 17, 2020 and the witness stated in summary the following: Cenko was not familiar with Respondent's harassment or retaliation policies. If an employee feels they are being harassed they can report to management, Human Resources and there are several posters in the breakroom with options to report. Cenko was not familiar with how complaints of harassment are handled. Cenko was aware that Respondent has a discipline policy but discipline depends on the severity of the violation. The discipline is handled by the Market Manager or Human Resources. In her whole career, Cenko has only ever had a serious situation between a customer an employee once and that was with Complainant.

Cenko was not aware of customers telling Complainant to "go back where he came from" or that they "can't believe a black guy is working." Cenko did go to another branch that Complainant was working at, under the instruction of the Market Manager, to witness Complainant being issued discipline for calling a customer a "fucking clown." Cenko was not aware of Spencer showing Complainant a video on her phone of her son saying the word "nigga" repeatedly.

The issue with Complainant and a customer referencing a noose happened at Cenko's branch. Cenko returned from lunch and Complainant was in the breakroom. Brianna Gooden ("Gooden") was in the breakroom with Complainant. Complainant was upset because a customer said something about a noose. Cenko asked Complainant what happened for that comment to transpire. Complainant got defensive and said that he was the "victim." Complainant then said that he couldn't stay for the rest of his shift. Cenko asked Complainant if he was able to count his drawer and Complainant said that he could. Complainant counted his drawer and went home. Cenko contacted Souers and Souers handled the situation.

Cenko was not part of Complainant's termination. Cenko understood that Complainant was terminated for several unprofessional incidents but did not know when the decision was actually made. Souers made the decision to terminate Complainant.

3.   **Brianna Gooden ("Gooden") – Branch Manager, previous Senior Relationship Banker**
This phone interview was conducted on March 17, 2020 and the witness stated in summary the following: Respondent does not tolerate harassment or condone retaliation.

7



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

If an employee feels they have been harassed they can go to a manager they feel comfortable with and report the harassment. The manager will then give the information to upper management and the situation is investigated. Gooden did not have details on what Respondent's discipline policy was.

Complainant made Gooden aware of a customer telling Complainant to "go back where he came from." Gooden said she was aware of other things that happened at the branch but never heard anything first hand. Gooden also said she was not familiar with a customer saying they "couldn't believe a black guy was working" or that Spencer showed Complainant a video on her phone of her son saying the word "nigga."

Gooden was informed by Beth Cenceleski ("Cenceleski") and Complainant about an issue that took place between Complainant and a customer when a customer called Complainant names and Complainant did not hold back on responding. Gooden was not sure of details but remember that an incident took place.

The day the comment about the noose took place, Gooden was at the same branch as Complainant but did not witness the interaction. Gooden walked over to the breakroom and saw that Complainant was upset. Complainant told Gooden that a customer commented on Complainant's neck tie. At first, the customer complimented it. The customer then began to describe Complainant's tie as a noose hanging from a tree. At that point, Complainant said he finished the transaction with no emotion and went to the breakroom. Gooden asked for the customer's name because she believed Complainant's account should be closed for making such comments. Complainant told Gooden that it didn't matter because Respondent wouldn't do anything about it. At that time, Cenko came into the breakroom. Gooden told Complainant to tell Cenko what happened. Complainant told Cenko the story and Cenko said something along the lines of, "Why would he do that?" Complainant then got upset and said that Cenko was victim shaming. Gooden did not take Cenko's comment the same way Complainant did and it did not seem to appear that Cenko was shaming Complainant but Gooden understood how Complainant took it as well. Complainant then stated that he was going to go home and Cenko told him to go.

Gooden was not exactly sure why Complainant was terminated or when the decision to terminate was made but she knew it had to do with multiple conduct issues.

4.  **Rebecca Cross ("Cross") - Teller**
    This phone interview was conducted on March 17, 2020 and the witness stated in summary the following: Cross was not aware of customers or employees ever making racially driven comments to Complainant other than when a customer referenced a noose. The customer that made the noose comment was known for making inappropriate comments to employees, regularly. The day the noose comment was made, Cross saw the customer who said it leave, wave his arm and say something like, "Whatever, you're

8



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

not worth it." Then Cross walked to the breakroom and saw that Complainant was upset. Complainant told Cross that a customer told him his tie looked like a noose. The comment was something along the lines of, "do you remember when black people would get hung by a noose?" Cross calmed Complainant down then went back to work. Cross let Cenko know that she needed to come back from lunch. Cross has not seen the customer, who regularly visited the branch, back to the branch since.

5.   **Rigoberto Rodriguez ("Rodriguez") – Financial Services Manager**
This phone interview was conducted on March 17, 2020 and the witness stated in summary the following: Complainant told Rodriguez about a customer saying that they could not believe a black man was working at the branch he was a but that was the only time Rodriguez heard of racial comments being made toward Complainant.

Rodriguez was present during a different situation involving Complainant. A customer who regularly visited the branch came in and wanted to cash a money order. Complainant declined the transaction because of Respondent's procedures. Because Complainant was a float teller and not at the branch regularly, he was not aware that this customer was a regular and Respondent will make exceptions if they have built a relationship with the customer. Complainant did not make an exception. The customer attempted to talk to Cenceleski about doing the transactions and Complainant stated that he had already told the customer they could not do the transaction. The customer told Complainant to quit acting like a "bitch" and Complainant replied, "You are lucky you are not a man because I would jump over the desk" and "put hands" on the customer. At some point, Complainant made a comment about the customer's make-up and said she looked like a "fucking clown." Complainant then threw the money order at the customer. Rodriguez separated Complainant and the customer and attempted to calm the customer down. Complainant was upset that Cenceleski did back him up and didn't recognize he had done anything wrong. Rodriguez contacted the District Manager and Human Resources to handle the situation. Souers assured Rodriguez that Complainant would no longer float to their branch.

6.   **Brian Souers ("Souers") – Market Manager**
This phone interview was attempted but The Commission was unable to make contact with Souers.

7.   **Beth Cenceleski ("Cenceleski")**
This phone interview was attempted but The Commission was unable to make contact with Cenceleski.



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

**C.**  **Employee Written Statements from February 27, 2019**

    **1.**  **Written Statement from Cathy Mettert ("Mettert")**
This statement was provided by Respondent and states in summary the following: On February 27, 2019, Mettert emailed Cenko and stated that Complainant was two (2) teller windows down from her and was assisting a regular customer. Mettert did not hear the customer make a comment to Complainant. This specific customer is known for making jokes and telling riddles while employees assist him. Mettert heard Complainant raise his voice and say, "Oh no, you just didn't say something about a noose to me!" The customer was at a loss for words. Complainant then stated that he couldn't believe the customer said that to him and that he needed to get away from the customer before he said or did something that he shouldn't. Complainant made a few more comments before he left his window. Complainant went to the breakroom and could be heard out in the lobby. Mettert believed Complainant finished the customer's transaction before he left his window.

    **2.**  **Written Statement from Brianna Gooden ("Gooden")**
This statement was provided by Respondent and states in summary the following: On February 28, 2019, Gooden typed a statement stating that the day before she walked into the breakroom and found Complainant leaning against the refrigerator and showing signs that he was upset. Gooden asked Complainant what was wrong. Complainant said he was a victim of a hate speech done by a customer. Complainant stated that the interaction began normal but then the customer stated that Complainant's neck tie was the "wrong kind." Complainant said he asked the customer what he meant and the customer started to describe a noose. Complainant wanted to give the customer a change to explain further in case Complainant was interpreting the comment wrong but then the customer said, "You know the ones that hang from trees." Complainant said he at that point he left the window and went to the breakroom to cool down. A few minutes after trying to calm Complainant down, Cenko entered the breakroom. Complainant gave Cenko a brief description of what happened and how the customer compared his neck tie to a noose. Cenko then made a comment along the lines of, "Why would he say that?" At that moment, Complainant felt he was being accused of doing something that would have justified the customer using a hate speech against him. Complainant got more upset and started to argue with Cenko about the situation. Complainant stated that he needed to leave and Cenko said he could go home for the day.

**D.**  **Complainant's Discipline**

    **1.**  **Termination Document dated March 4, 2019**
This document was provided by the Respondent and states in summary: Complainant was terminated on March 4, 2019 for violation of policies and procedures.



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

**E.   Complainant's Personnel File Notes and Emails**

    **1.   Case Snapshot (March 4, 2019)**
        The document was provided by the Respondent and states in summary the following:
        Complainant was put on a Final Warning in August 2018, under Wells Fargo and prior to
        conversion to Respondent. The Final Warning was given to Complainant by Souers and
        it was for using offensive language to a customer. On February 22, 2019, Complainant
        engaged in an altercation with a customer in the drive thru. During the altercation,
        Complainant argued back and forth with a customer and the incident ended with
        Complainant saying, "No, you shut-up" to the customer. On February 27, 2019,
        Complainant was involved in an interaction with a customer in the branch. The manager
        entered the branch and could hear Complainant yelling from the breakroom from the
        teller line. Complainant stated that a customer told him a joke about a noose that
        offended him and wanted to go home for the day. On February 28, 2019, Souers
        contacted Complainant to inform him that he was on paid administrative leave.

        On March 1, 2019, Complainant contacted Employee Relations and left a voicemail. On
        March 4, 2019, Ashley Majeski ("Majeski") returned Complainant's phone call and
        Complainant informed her that customers have made disrespectful and racial comments
        to him. Complainant also stated that he did not feel supported by management. Majeski
        contacted Souers and regarding the concerns and Souers conducted interviews with
        employees at the branch to see if there were any concerns regarding discrimination. No
        concerns were disclosed. On March 4, 2019, Souers, in conjunction with Human
        Resources made the decision to terminate Complainant's employment for having
        altercations with customers after receiving a Final Written Warning for his behavior in
        August 2018. Souers would also work with Cenko to further investigate the February 27,
        2019 incident and based on the findings, Souers would determine the appropriate course
        of action for the customer.

    **2.   Email Exchange between Souers and Cenko (February 28, 2019)**
        The emails were provided by the Respondent and state in summary the following: On
        February 28, 2019 at 4:17 p.m., Cenko emailed Souers to reference a previous phone
        conversation between the two of them. In the email, Cenko stated that she was
        documenting the previously discussed instances per Souers request. Cenko explained
        that Complainant has had multiple altercations with customers and employees throughout
        his employment. On February 22, 2019, Complainant got into a verbal altercation with a
        customer in the drive thru. The customer left the drive thru and came inside to complete
        her transaction. Spencer spoke with the customer about the transaction in the drive thru.
        The customer told Spencer that she went to the drive thru and Complainant asked how he
        could help her. The customer asked Complainant what the withdraw limit was in the
        drive thru and Complainant stated that he could not tell her but if she wanted to tell him
        how much she wanted to withdraw then he could let her know if he could do it. The
        customer got upset because she didn't understand why he couldn't tell her. The customer



### BEFORE THE FORT WAYNE
### METROPOLITAN HUMAN RELATIONS COMMISSION

then stated that she wanted to withdraw $2,000.00. Complainant told her that he could not process that amount in the drive thru. The customer got more upset and wanted to know why Complainant could have just told her that in the first place. At that point, the customer and Complainant argued back and forth. The customer had enough and told Complainant to "shut up." Complainant replied, "No, you shut up."

Spencer then went and spoke to Complainant. Complainant had the same story but the only difference was that Complainant stated he only said, "No, you." After hearing both sides of the story, Spencer spoke with Complainant about professionalism in the workplace and how to respond to customer negativity. Complainant did not agree with Spencer and said that no one would disrespect him without him responding to them. Spencer reminded Complainant that responding to a customer in a negative way, no matter what is said, could result in negative team member consequences.

On February 27, 2019, Complainant was involved in an altercation with another customer. Upon entering the branch, Cenko could hear Complainant from the teller line yelling in the breakroom. Cenko went to the break room to find out what was going on. Complainant was in the break room with another employee explaining the situation. Complainant stated that a customer told him a joke about a noose. Cenko asked why the customer would say that. Complainant got in Cenko's face and said he was the victim and I had no right to ask him that. He continued to say that he was the victim. Complainant then asked to count his drawer and leave. Cenko said he could go.

Cenko stated that behavior similar to these incidents is a pattern for Complainant and that Complainant was issued a Final Written Warning in August 2018. Cenko stated that Complainant only works twenty (20) hours a week and in one (1) week has gotten into two (2) verbal altercation with customers and then with Cenko. Cenko stated that she was concerned for customers and team members if Complainant's behavior continues to escalate.

Souers responded to Cenko's email on February 28, 2019 at 4:31 p.m. and stated that he had delivered the August 2018 Final Written Warning to Complainant and due to the severity of the occurrence he was clear with Complainant that any additional unprofessionalism would result in termination. Souers also stated that he was saddened in the way that some customers speak to employees but it is their job to take the high road and remain professional. Souers stated that Complainant has not shown the ability to do that.

Souers made a second reply to Cenko's email on February 28, 2019 at 6:08 p.m. and stated that he had discussed the issues with Gary Wolfe and Complainant would be put on administrative leave until they could connect on the next steps. Souers said that he called Complainant and informed him that he was on paid administrative leave for March 1, 2019 and March 2, 2019.

12



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

3. **Email Exchange between Souers and Majeski (March 4, 2019)**
The email was provided by the Respondent and states in summary the following: Souers stated that he had a meeting with Complainant around 11:45 p.m. on March 4, 2019 to deliver the termination notice to Complainant. To ensure that Souers felt comfortable with his decision to terminate he wanted to give Complainant the opportunity to share any more of his view or recollection of events. After listening to Complainant and going over possible alternative choices that could have been made when dealing with difficult customers, Souers asked Complainant if Respondent were to move forward with their working relationship could Complainant commit to staying professional and taking the high road when encountered with a difficult customer. Complainant's clear and honest response was that he could not if he were to have to encounter someone that disrespected him. The conversation lasted about an hour. Complainant stated that he felt customers and management showed "racial ignorance" in comments they have made to him. Souers stated that he would report Complainant's concerns to Human Resources and follow up to make sure they get handled correctly. Complainant acknowledged that his actions and behaviors towards customers were the reason for their meeting and that his comments about potential biases or discrimination were separate.

Souers then asked the Regional Manager, Jess Hopkins, to join the room and witness Souers deliver Complainant's termination. Souers told Complainant that due to an additional instance of behaving unprofessionally with a customer after being put on a Final Written Warning within the past year, Respondent was separating Complainant's employment.

F. **Employee Files**

At the time of the on-site, the Commission requested a list of all relevant employees. From that list, the Commission randomly chose a number of files to examine to determine whether any other individuals were treated more favorably than Complainant. The Commission did not find another employee that was placed on a Final Written Warning and violated another policy within a year that was not terminated.

The determination below is based on the above summarized evidence.

## IV. ANALYSIS

Fort Wayne City Code, Ordinance G-21-78, as amended ("Ordinance"), makes it unlawful for an employer to discriminate against an individual on the basis of any one of several classifications, including but not limited to their race, sex, color, religion or national origin. Because the Ordinance, like the Indiana Civil Rights Law ("ICRL"), parallels Title VII in its proscription of discrimination based upon expressed grounds (*e.g.*, race, sex, color, religion or national origin), federal decisions interpreting Title VII are persuasive when

13



### BEFORE THE FORT WAYNE
### METROPOLITAN HUMAN RELATIONS COMMISSION

reviewing a charge of discrimination under the Ordinance. A violation of Title VII of the Civil Rights Act of 1964, as amended and the Ordinance, may be established after a thorough analysis of relevant evidence.

### A.      Evidence

To establish a claim of discrimination, Complainant bears the initial burden of demonstrating that the evidence supports such a claim. As set out in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, (7th Cir. 2016) the Commission's analysis will consider all of the evidence in its entirety. Complainants must utilize the familiar burden shifting analysis first set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Only if Complainant can successfully produce evidence establishing each element of a *prima facie* case does the burden shift to Respondent to articulate a legitimate, nondiscriminatory reason for its employment action.

<u>Prima Facie Case – Harassment</u>

To establish an actionable claim of harassment discrimination, Complainant must show that he or she was subjected to harassment so severe or pervasive that it altered the conditions of employment. In assessing a hostile work environment claim, this Commission looks to all the surrounding circumstances including the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or mere offensive utterance, and whether the conduct unreasonably interfered with the employee's reasonable work performance.

To establish a prima facie case of harassment under a hostile work environment theory, a complainant must demonstrate: (1) Complainant was subjected to unwelcome comments and/or conduct; (2) The comments and/or conduct were based on Complainant's protected class; (3) The comments and/or conduct were severe or pervasive as to create a hostile work environment or; and (4) There is a basis for employer liability.

### 1.      Complainant was subjected to unwelcome comments and/or conduct.

A complainant must establish that he or she was subjected to unwelcome comments and conduct. In making this inquiry, the Commission must examine the totality of circumstances, such as the nature of the comments and/or conduct and the context in which they occurred. When evidence suggests that a Complainant instigated the comment and/or conduct, such conduct may not be characterized as unwelcome. However, mere participation on the part of the Complainant does not necessarily mean that the comments and/or conduct were welcome. One factor to be considered in determining whether the comments and/or conduct are unwelcome is whether the Complainant objected when the alleged harassment occurred. Another factor to be considered is whether the Complainant complained of the comments and/or conduct to the Respondent. Based on reasonable assumption, when an individual objects to and complains to management about comments and/or conduct, it is unwelcome. Although these factors are not always determinable as to whether the comments or conduct is unwelcome, they are factors to be considered.

In this case, Complainant alleged that while working at the Decatur branch a customer told him to go back where he came from, at the Van Wert branch a customer said, "I can't believe a black guy is working here," a customer called him a "bitch" and said he wasn't a man, Nancy Spencer ("Spencer") showed him a

14



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

video on her cell phone of her son saying the word "nigga" repeatedly, and a customer referred to his neck tie is as a noose and that Complainant should be hanging from a tree.

Complainant alleged that around January 2019, Spencer showed Complainant a video of her son repeatedly saying the word "nigga." The Commission was unable to find any evidence to suggest that this occurred. Spencer also denied ever showing Complainant a video of her son. Because The Commission was not able to find any evidence to suggest that Spencer showed Complainant the video The Commission will not consider this element met and end the analysis in regards to this allegation.

Complainant alleged that around the summer of 2018 he informed Brian Souers ("Souers") that while working at the Decatur branch a customer told him to go back where he came from and while at the Van Wert branch a customer said they could not believe a black guy was working there. Souers' employment with Respondent ended prior to Complainant filing his complaint. The Commission attempted to contact Souers for an interview but was unable to make contact. Testimony from Brianna Gooden ("Gooden") revealed that Complainant informed her about a customer telling Complainant to go back to where he came from and testimony from Rigoberto Rodriguez ("Rodriguez") revealed that Complainant informed him of a situation at the Van Wert branch in which a customer said they couldn't believe a black guy worked for Respondent.

Complainant also alleged that in the summer of 2018, a customer called him a "bitch" and stated that he was not a man. Testimony from Rodriguez revealed that a Complainant and a customer got onto a verbal altercation and the customer told Complainant that he needed to quit acting like a bitch. Rodriguez was not aware of the customer telling Complainant that he was not a man.

Lastly, Complainant alleged that on February 27, 2019, a customer referred to his neck tie as a noose. Respondent is not disputing this allegation. Testimony from Spencer, Cenko, Gooden and Cross and well as written statements from Gooden and Cathy Mettert revealed that a customer did reference a noose while Complainant was assisting him. The Commission will consider this element met in regards to these allegations and continue on with the analysis.

**2.      The comments or conduct were based on Complainant's protected class.**

A Complainant must prove that the alleged comments or conduct were made because of his or her protected characteristic. In other words, the Complainant must prove that the comments and/or conduct were made on account of his or her race, sex, religion, etc. In most instances, an alleged harasser who makes unwelcome comments and/or conduct to all or a majority of employees is not basing the comments and/or conduct on the employees' protected class. Although unpleasant, the fact that an alleged harasser is treating everyone poorly and unfairly does not constitute an act of discrimination. Also, when facts show that the comments and/or conduct are based on a personality conflict between the individuals, this too does not constitute harassment under Title VII. Again, the Complainant must show that the comments and conduct were made because of his or her protected characteristic.

In this case, Complainant believed that the comments made about him were based on his race, black. As stated above, The Commission found evidence to suggest that while Complainant was working at the Decatur



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

branch a customer told him to go back where he came from, at the Van Wert branch a customer said, "I can't believe a black guy is working here," a customer called him a "bitch" and said he wasn't a man, and a customer referred to his neck tie is as a noose.

All of these alleged comments appear to be directly related to Complainant's race, black, with the exception of the customer that allegedly called Complainant a "bitch" and stated that Complainant was not a man. The Commission could not find any evidence to suggest that these two (2) comments were made based on Complainant's race. The Commission will end the analysis in regards to these two comments.

The Commission will consider this element met in regards to Complainant being told to go back where he came from by a customer, that a customer could not believe a black guy was working and a customer referencing a noose when talking about Complainant's neck tie. The Commission will continue with the analysis in regards to these allegations.

> ### 3.    The comments and/or conduct were severe or pervasive as to create a hostile work environment.

In evaluating whether the comments and/or conduct rises to the level of a hostile environment, the Commission examines all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Comments and harassing acts that are continual, commonplace, and of an ongoing nature are more likely to be deemed pervasive. Furthermore, harassment that escalates from comments to physical touching or physical threats are more likely to be considered as severe as to create a hostile work environment. Moreover, a hostile work environment is one that is both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."

In this case, testimony from Gooden revealed that Complainant told her that a customer made a comment to Complainant at the Decatur branch that Complainant should go back where he came from. Testimony from Rodriguez revealed that Complainant told him that a customer made a comment about how they could not believe a black man was working at the Van Wert branch. While testimony reveals that that the comments were offensive they are not humiliating to the point to create an objectively hostile workplace. Furthermore, the evidence reveals that the comments were made by two (2) different customers at two (2) different locations. Two (2) stray comments by two (2) separate customers at two (2) separate locations do not rise to the frequency of pervasive. The Commission was not able to find evidence to suggest that Complainant reported these comments or continued to have issues with these two (2) specific customers. The Commission will not consider this element met and will end the analysis in regards to these two specific comments.

Complainant also alleged that a customer referenced a noose when talking about his neck tie on February 27, 2019. Testimony from Gooden revealed that she was at the same branch as Complainant but did not witness the interaction. Gooden walked over to the breakroom and saw that Complainant was upset. Complainant told Gooden that a customer commented on Complainant's neck tie. At first, the customer complimented it. The customer then began to describe Complainant's tie as a noose hanging from a tree. At

16



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

that point, Complainant said he finished the transaction with no emotion and went to the breakroom. Gooden asked for the customer's name because she believed the customer's account should be closed for making such comments. Complainant told Gooden that it didn't matter because Respondent wouldn't do anything about it. At that time, Cenko came into the breakroom. Gooden told Complainant to tell Cenko what happened. Complainant told Cenko the story and Cenko said something along the lines of, "Why would he do that?" Complainant then got upset and said that Cenko was victim shaming. Gooden did not take Cenko's comment the same way Complainant did and it did not seem to appear that Cenko was shaming Complainant but Gooden understood how Complainant took it as well. Complainant then stated that he was going to go home and Cenko told him to go. Gooden also provided Respondent with a written statement that stated Complainant told her that the customer told him that his neck tie was the wrong kind. At that point, the customer started to describe a noose. Complainant stated that he wanted to give the customer the benefit of doubt in case he was interpreting the customer wrong then the customer said, "You know, the ones that hang from trees."

A written statement from Mettret revealed that Mettret was two (2) windows down from Complainant. All of a sudden Mettret heard Complainant say, "Oh no, you just didn't say something about a noose to me!" Mettret said the customer was at a loss for words. Complainant went on to say that he couldn't believe the customer said that to him and that Complainant needed to get away before he said or did something that he shouldn't do. Testimony from Cross revealed that the day the noose comment was made, Cross saw the customer who said it leave, wave his arm and say something like, "Whatever, you're not worth it." Then Cross walked to the breakroom and saw that Complainant was upset. Complainant told Cross that a customer told him his tie looked like a noose. The comment was something along the lines of, "do you remember when black people would get hung by a noose?" Cross calmed Complainant down then went back to work. Cross let Cenko know that she needed to come back from lunch because an incident occurred with Complainant.

The customer only had one interaction with Complainant but the comments made by the customer appear to be both objectively and subjectively offensive. A reasonable person could find that this customer's comments be hostile or abusive, as Complainant did. Based on the evidence found, the Commission will consider this element met in regards to the comments regarding the noose and continue the analysis.

### 4.    Basis for employer liability

An employer is subject to vicarious liability for harassment committed in the workplace. Generally, an employer is liable for a hostile work environment claim if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment. To establish employer liability for harassment by another co-worker or a non-employee, a complainant must show that the employer knew or should've known about the harassment and failed to take proper remedial action. A complaint must offer evidence indicating that the complainant notified the employer about the harassment or that the harassment was so pervasive that one may infer that the employer knew about it. Notice or knowledge by the employer of the harassment is a prerequisite for liability. A Complainant must present evidence that he or she gave the employer enough information to make a reasonable employer think there was some probability that the harassment was occurring. Notice may come from someone other than the complainant. Proper remedial action may include a competent and prompt investigation, discipline of the harasser; acknowledge to the victim that the harassment has been addressed with the alleged harasser, and possible compensation.

17



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

In this case, it is not being disputed that Complainant reported that the customer made harassing comments about his neck tie and referencing a noose to Respondent. Testimony from Gooden and Cenko revealed that after the incident, Complainant went to the breakroom to calm down and Cenko came to the breakroom to find out what happened. Gooden and Cenko stated that Complainant asked to go home after explaining the situation to Cenko and Cenko allowed Complainant to leave. An email from Cenko to Souers sent the following day revealed that Cenko informed Souers of the situation and that she had collected statements from other employees present. Souers responded to Cenko and informed her that Complainant was placed on paid leave until they could further investigate. A Case Screenshot provided by Respondent revealed that on March 1, 2019, Complainant contacted Employee Relations and left a voicemail. On March 4, 2019, Ashley Majeski ("Majeski") returned Complainant's phone call and Complainant informed her that customers have made disrespectful and racial comments to him. Complainant also stated that he did not feel supported by management. Majeski contacted Souers and regarding the concerns and Souers conducted interviews with employees at the branch to see if there were any concerns regarding discrimination. No concerns were disclosed. The Case Screenshot also noted that Souers would continue to work with Cenko to investigate the issue between Complainant and the customer and based on the findings Souers would determine what the appropriate action for the customer would be. The Commission was unable to speak with Souers about the course of action that was taken with the customer. Souers employment with Respondent ended on March 12, 2019, shortly after the incident took place but testimony from Cross revealed that the customer was a regular and had not been back in the branch since the incident. Because it appears Respondent took immediate action to address the issue and no further harassment appears to have taken place, the Commission will not consider this element met and end the analysis.

Prima Facie Case – Retaliation

To establish a prima facie case of retaliation requires evidence as to the following three (3) elements: (1) Complainant engaged in a Title VII statutorily protected activity; (2) Complainant suffered an adverse action; and (3) There is a causal connection between the two events, or more indirectly, after Complainant opposed the Respondent's discriminatory practice, was Complainant, and no other similarly situated employee who did not complain of discrimination, the only employee who was subjected to a materially adverse action even though Complainant was performing to the legitimate expectations of Respondent.

1.  Complainant engaged in a Title VII statutorily protected activity

Title VII makes it illegal for an employer to retaliate against an employee for opposing a Title VII unlawful activity or for participating in the administrative process. A Complainant may demonstrate that they engaged in a Title VII statutorily protected activity by showing that they explicitly or implicitly communicated to Respondent the belief that its activity constituted unlawful discrimination under Title VII and Ordinance G-21-78. The later statutes prohibit retaliation against an individual because he or she has engaged in a protected activity, which includes opposing a discriminatory practice. A plaintiff's protest may be broad or ambiguous as long as the protest would have reasonably been interpreted as opposition to such unlawful discrimination or harassment. Title VII also prohibits retaliation for participation in a statutory complaint process that includes, but not limited to, filing a charge, testifying or assisting in an investigation, proceeding, hearing, or lawsuit under the statutes enforced by the Commission. A Complainant is protected against retaliation even if they are

18



## BEFORE THE FORT WAYNE
## METROPOLITAN HUMAN RELATIONS COMMISSION

mistaken about the unlawfulness of the challenged practice. It is important to note, however, that a complaint of discrimination is not a safety net protecting employees from adverse action. An employer does not lose the ability to discipline an employee who engages in misconduct simply because the employee communicated to the employer that unlawful discrimination occurred.

In this case, it is not being disputed Complainant participated in a Title VII protected activity. Testimony from Cenko and Gooden, a Case Snapshot provided from Respondent and emails between Cenko and Souers reveal that Complainant informed Respondent of the harassing comments made by a customer on February 27, 2019. Furthermore, On March 1, 2019, Complainant contacted Employee Relations and left a voicemail. On March 4, 2019, Majeski returned Complainant's phone call and Complainant informed her that customers have made disrespectful and racial comments to him. Complainant also stated that he did not feel supported by management. Majeski contacted Souers regarding the concerns. The Commission will consider this element met.

### 2. Adverse Action

Adverse employment action has been defined quite broadly in the Seventh Circuit Federal Court of Appeals, and that broad interpretation has been adopted by this Commission. The Court has articulated three general categories of actionable, materially adverse employment actions for the purposes of establishing a prima facie case of retaliation (1) Those cases in which the employee's compensation, fringe benefits, or other financial terms of employment are reduced, including termination; (2) Those cases in which a nominally lateral transfer with no change in compensation significantly reduces the employee's career advances by preventing an employee from using their skills and experience, so as to "stunt" an employee's career; and (3) Those cases in which the employee is not moved to a different job or the skill requirements of the employee's present job altered, but the conditions in which the employee works are changed in a way that subjects an employee to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in the employee's workplace environment.

In this case, Complainant alleged that he was terminated on March 4, 2019 after reporting harassment based on race on February 27, 2019. It is not being disputed that Respondent terminated Complainant on March 4, 2019. Respondent provided a termination document stating that Complainant was terminated on March 4, 2019 for violating Respondent's policies. The Commission will consider this element met and continue the analysis.

### 3. Causal Connection / Similarly Situated

To satisfy this element, Complainant must produce evidence to show a causal connection between the complaint of discrimination and the adverse employment action taken. This connection may be established through temporal proximity, or the length of time between Complainants protected activity and the adverse employment action. To be successful in this showing, the length of time elapsed between these two events should be relatively short. If the length of time is insufficient or questionable to establish this connection, Complainant must also have been performing to the legitimate expectations of the employer.

19



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

In this case, there is no evidence to suggest that the decision to terminate Complainant's employment was made because Complainant reported harassment to Respondent. Respondent's Case Snapshot shows a note that Souers delivered a Final Warning to Complainant in August 2018, under Wells Fargo policies, for getting into an argument with a customer and using offensive language. Testimony from Rodriguez revealed that a customer who regularly visited the branch came in and wanted to cash a money order. Complainant declined the transaction because of Respondent's procedures. Because Complainant was a float teller and not at the branch regularly, he was not aware that this customer was a regular and Respondent will make exceptions if they have built a relationship with the customer. Complainant did not make an exception. The customer attempted to talk to Cenceleski about doing the transactions and Complainant stated that he had already told the customer they could not do the transaction. The customer told Complainant to quit acting like a "bitch" and Complainant replied, "You are lucky you are not a man because I would jump over the desk" and "put hands" on the customer. At some point, Complainant made a comment about the customer's make-up and said she looked like a "fucking clown." Complainant then threw the money order at the customer. Rodriguez separated Complainant and the customer and attempted to calm the customer down. Complainant was upset that Cenceleski did back him up and didn't recognize he had done anything wrong. Rodriguez contacted the District Manager and Human Resources to handle the situation. Souers assured Rodriguez that Complainant would no longer float to their branch.

Respondent's Case Snapshot shows that on February 22, 2019, Complainant was involved in a verbal altercation with another customer in the drive thru. Complainant and the customer argued back and forth and ended with Complainant saying, "No, you shut up." Testimony from Spencer revealed that the customer wanted to withdraw money and wanted to know the withdraw limit. Complainant informed the customer that he could not disclose what the limit was and to request an amount and then he could tell her if he could do it. The customer got upset and requested $2,000.00. Complainant told the customer that he could not do that amount through the drive thru. The customer told Complainant to "shut-up." Complainant then told the customer, "No, you shut up." Complainant explained the situation the same way except he only admitted to saying, "No, you." After this incident, Souers and the Human Resources Business Partner decided to terminate Complainant. Spencer was unaware of why it took so long to deliver the termination to Complainant.

On February 27, 2019, five days after the incident in the drive thru, the incident involving comments about a noose to Complainant took place. Respondent's Standards of Conduct state that Respondent expects employees to behave in a manner to provide a proper, safe and healthy atmosphere. Some examples of prohibited behavior would be refusal to accept or follow directions, causing a disturbance by yelling or using obscene or indecent language, threatening, intimidating or assaulting another employee, client or customer and violating any other policy, practice or workplace procedure. Respondent's Corrective Action Policy states that a violation of Respondent's policies, practices or procedures may be so serious that a single incident could result in termination. Other violations may result in increasingly serious warnings and a chance to improve performance prior to termination. In the email from February 28, 2019, Souers told Cenko that in August 2018, Complainant was put on a Final Warning because of the severity of the situation and it was clearly explained that any unprofessionalism or insubordination would result in Complainant's termination. Testimony from Gooden and Cenko revealed that she was not sure when the decision to terminate Complainant took place but she did know that Complainant was terminated for multiple conduct issues.



BEFORE THE FORT WAYNE
METROPOLITAN HUMAN RELATIONS COMMISSION

While the amount of time between Complainant reporting the harassment and Respondent terminating Complainant's employment is relatively short, Complainant was not performing to the legitimate expectations of Respondent. Complainant was placed on a Final Warning in August 2018 and on February 22, 2019 got into an altercation with another customer. Because there is not sufficient evidence to suggest that there is a connection between the protected activity and Complainant's termination this element has not been met and The Commission will end the analysis.

## V.  CONCLUSION

Based upon these findings, **no probable cause** exists to believe that Respondent harassed Complainant based on his race, black or retaliated against him after reporting the harassment in violation of Title VII of the Civil Rights Act of 1964, as amended or Fort Wayne Ordinance G-21-78, as amended. Pursuant to Commission Rule 1-4.4(c)(1)(A) this case is dismissed as lack of probable cause.

**SO ORDERED** on this 30th day of April 2020.

Ina R Kesling

Commissioner

21

**02D09-2006-PL-000252**

Allen Superior Court 9

Filed: 6/30/2020 4:32 PM
Clerk
Allen County, Indiana
BB

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE ALLEN SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF ALLEN | ) | CAUSE NO: |

JOHNATHAN DECKER,                       )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )
                                        )
FLAGSTAR BANK, INC.,                    )
                                        )
                    Defendant.          )

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 in the Indiana Rules of Trial Procedure, Plaintiff, Johnathan Decker, hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**THEISEN & ASSOCIATES, LLC**

/s/Nathaniel O. Hubley
John C. Theisen, #549-02
Nathaniel O. Hubley, #28609-64
810 South Calhoun Street, Suite 200
Fort Wayne, IN 46802
Telephone: (260) 422-4255
Facsimile: (260) 422-4245
*Attorneys for Plaintiff*



CERTIFIED MAIL

7018 0360 0000 5590 6712

Flagstar Bank, Inc.,
Flagstar Bank, FSB
Registered Agent: Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, Indiana 46204

THEISEN & ASSOCIATES LLC
ATTORNEYS AT LAW
810 South Calhoun Street • Suite 200 • Fort Wayne, IN 46802

UNITED STATES POSTAGE
PITNEY BOWES
$ 007.500
02 1P    JUL 01 2020
0004737885
MAILED FROM ZIP CODE 46802

# NOTICE

Allen Superior Court 9

Johnathan Decker v. Flagstar Bank Inc                    02D09-2006-PL-000252

02D09-2006-PL-000252

To: Flagstar Bank Inc
6302 E State Blvd
Fort Wayne, IN 46805

To view any documents attached, type the hyperlink provided below in a web browser. Note this link is valid for 21 days. If you need a copy of this document, download it immediately.

If a document is confidential, the system will prompt you to enter your email address. However, because you received this paper notice, the court does not have a valid email address for you. Please file an Appearance with the clerk and include a valid email on the Appearance.

If you are unable to download the document attached and need a physical copy of the document, please contact the clerk or court.

EVENTS

| Entry Date | File Stamped /<br>Order Signed | Event and Comments |
|---|---|---|
| 07/08/2020 | 07/08/2020 | Order Issued<br>Order for Case Management Conference |

https://public.courts.in.gov/TrialCourt/Document?id=262f2b22-3d44-4d95-becd-c527fbe17db6

| OTHER PARTY - NOTICED | OTHER PARTY - ENOTICED |
|---|---|
| N/A | John Charles Theisen (Attorney)<br>Nathaniel O. Hubley (Attorney) |

| 07/08/2020 | | Hearing Scheduling Activity<br>Initial Hearing scheduled for 11/12/2020 at 9:00 AM. |
|---|---|---|

| OTHER PARTY - NOTICED | OTHER PARTY - ENOTICED |
|---|---|
| N/A | John Charles Theisen (Attorney)<br>Nathaniel O. Hubley (Attorney) |